## Commonwealth v. Press Company, Limited, Appellant.

### [Marked to be reported.]

*Public officers—Embezzlement—Fraud—Public advertisements.*

The proprietor of a newspaper, who agrees to pay a commission to a public officer for the purpose of procuring official advertisements, and the price of the advertisements is enhanced to the public by the amount of the commission, is liable to the commonwealth for the amount of the commissions paid.

Where the proprietor of a newspaper agrees to pay large commissions for official advertising to the person who agrees to procure the advertising, and the proprietor makes no inquiry as to who is to actually receive the commissions, or as to the relation of the person with whom he is dealing to the public official controlling the advertising, he is guilty of such negligent conduct as will entitle the commonwealth to recover from him the amount of the commissions which he paid.

*Form of action—Trespass—Amendment.*

In such case it seems that the proper form of action is trespass and not assumpsit. After verdict, the court will amend if necessary.

*Interest—Damages—Tort.*

In such a case interest will be allowed not as interest but as compensation for the delay, of which the rate of interest affords the fair legal measure.

Argued May 31, 1893. Appeal, No. 28, May. T., 1893, by defendant, from judgment of C. P. Dauphin Co., Sept. T., 1891, No. 570, for plaintiff, on case tried by court without jury. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL, DEAN and THOMPSON, JJ.

Assumpsit for commissions illegally paid to public officer.

At the trial before McPHERSON, J., when Robert T. Cook, managing editor of "The Press," was on the stand, defendant made the following offer : ·

Mr. Gilbert: "I desire to show by this witness that, continuously during his connection with this paper, it has been in the habit of paying persons who controlled advertising matter, and of paying them varying rates according to the degree of the advertising and quantity of the matter to be advertised ; that in this respect in so dealing with these gentlemen he did not depart from the custom and the business practice that were not only by this paper followed but are followed by other papers of

similar character in the city of Philadelphia." Objected to and excluded. [4]

Mr. Gilbert: " The defendant proposes to prove by this witness that it has been the custom and business usage of the defendant for a long period of time to pay commissions to such persons, representing citizens of this state and other states, offering to the defendant matter for insertion in its advertising columns ; this for the purpose of showing that the act of the defendant with respect to giving a commission after payment had been made thereof to Henry Graffin and to Mr. Bell, was not prejudicial to the interests of the commonwealth, and was not exceptional conduct on the part of the defendant, but was in accordance with its practices, proper uses, and justifiable, and that such was the usage and practice and custom of other papers of similar character published in the city of Philadelphia." Objected to and excluded. [5]

The court filed the following opinion :

" This case was submitted to the court for trial without a jury under the provisions of the act of 1874. We find the facts to be as follows :

" 1. The defendant is a limited partnership of this commonwealth and publishes a daily and weekly newspaper in the city of Philadelphia. It was engaged in this business in the years 1889 and 1891, and Robert T. Cook was then its business manager, authorized to act for it in receiving advertisements and in making contracts concerning the rates to be paid by advertisers.

" 2. The act of 1887, P. L. 60, makes the following provisions in reference to the publication of the mercantile appraisers' list in the city of Philadelphia: The auditor general and city treasurer (who is also the county treasurer) are authorized to direct that publication be made in four newspapers, and to pay therefor the usual rates of advertising charged by the said newspapers to private customers, but not exceeding thirty cents a line for four insertions. The publishers' bills are to be certified by the appraisers and paid by the county treasurer; if the auditor general, who is authorized to audit the accounts for advertising, also approves the bills, the county treasurer receives credit for such payment in the settlement of his accounts for licenses with the commonwealth. The act contains other provisions not now important.

" This system imposes the cost of advertising upon the state, and in practice the county treasurer does not pay the publishers' bills until they have received the approval of an auditor general.

" 3. Sometime before May, 1889, Henry Graffen, who is now dead, but was then county clerk in the office of the auditor general, called upon Mr. Cook in his business office and offered to bring to the defendant the advertising of the list for that year at the rate of thirty cents per line for four insertions, if the defendant would agree to pay him a commission of forty per cent.   Mr. Cook demurred at the size of the commission, but, after being told that the business could not be had on any other terms, and that it would be taken elsewhere if the terms were not accepted, and after consultation with the advertising manager, accepted the proposition.   Either then or shortly afterwards the proper order to publish was given to the defendant, and the list was published as required by law.

" After publication had been made the defendant rendered its bill therefor to the county treasurer, the auditor general approved the bill and the county treasurer drew his check for the full amount claimed by the defendant.   The bill and the check were taken by Mr. Graffen to Mr. Cook on May 31st, and the latter receipted the bill and was given the check.   The bill and the check were both for $10,176.90, being the full charge of thirty cents per line, but after receiving the check Mr. Cook handed to Mr. Graffen the forty per cent agreed upon, or $4,070.76 ; and thus the amount actually received and kept by the defendant was only $6,106.14, instead of the amount for which the bill was rendered.   At Mr. Graffen's request the payment was made to him in cash, and what further became of the money the evidence does not disclose.

" [In this transaction Mr. Graffen was the agent either of the auditor general, or of the county treasurer, or of both ; but he did not say to Mr. Cook that he was an agent, and Mr. Cook (who did not know that he was a clerk in the auditor general's office) made no inquiry as to who he was or whom he represented, or by what authority he professed to control this official advertising.] [1]   In brief, nothing was said about these matters at either interview, nor was anything said about what was to be done with the money which the defendant agreed to

pay.   Mr. Graffen simply gave his name at the first interview without offering to explain his connection with the business, and Mr. Cook did not ask for further information.

" 4.  In the early part of the year 1891, Frank F. Bell called upon Mr. Cook in his business office and offered to bring to the defendant the advertising of the list for that year at the rate of thirty cents per line for four insertions, if the defendant would agree to pay him a commission of forty per cent.   Mr. Cook accepted the proposition, and Mr. Bell at once handed to him the proper order to make the publication.   This order drawn in favor of the defendant was in Mr. Bell's possession when the interview began (although Mr. Cook did not know that fact), but it was not to be delivered to the defendant unless the agreement to pay the commission of forty per cent was first made.

" The list was duly published and some days afterward the defendant rendered its bill therefor to the county treasurer, the auditor general approved the bill and the county treasurer drew his check for the full amount claimed by the defendant. The bill and the check were taken by Mr. Bell to Mr. Cook on April 15th, and the latter receipted the bill and was given the check.   The bill and the check were both for $11,664, being the full charge of thirty cents per line, but after receiving the check Mr. Cook handed to Mr. Bell the forty per cent agreed upon, or $4,665.60 ; and thus the amount actually received and kept by the defendant was only $6,998.40, instead of the amount for which the bill was rendered.   [The payment was made to Mr. Bell in cash, and he afterwards handed the entire amount to the county treasurer.]  [2]

" [In this transaction Mr. Bell was the agent of the county treasurer, but he did not say to Mr. Cook that he was an agent, and Mr. Cook made no inquiry as to who he was or whom he represented or by what authority he professed to control this official advertising.]  [3]   Nothing was said about these matters at either interview, nor was anything said about what was to be done with the money which the defendant agreed to pay.   Mr. Bell simply gave his name at the first interview without offering to explain his connection with the business, and Mr. Cook did not ask for further information.

" 5.  The commonwealth did not know that these commissions

had been paid by the defendant until after May 21, 1891. No demand for repayment or for compensation was made upon the defendant before the bringing of this suit on 1891.

"CONCLUSIONS OF LAW.

"It cannot be doubted that, if the commonwealth was suing such of its officers or agents as may have received or shared the commissions paid by the defendant, it would be entitled to recover. The duty of the commonwealth's officers was to obtain this advertising at the lowest price, not exceeding the usual rates charged to private customers, and in no event exceeding thirty cents per line for four insertions. Instead of making an honest effort, however, or indeed, so far as appears, any effort at all to discover what was the lowest price for which the work could be done, they or some of them agreed to pay the maximum price fixed by the act, although by the very agreement itself they were informed that the work could be done for at least forty per cent less. This of itself was a gross violation of duty which would support an action in tort for damages; and if we add to this the fact that they, or some of them, put into their own pockets the money which they could have saved for the state and which was in their power and possession as actual cash, it is not easy to speak accurately of their conduct without calling it embezzlement; and at all events it is certain that they could not have retained this money as against the commonwealth suing in assumpsit to recover.

"It is also beyond controversy that if the defendant had known, when the contracts for commissions were made, that Mr. Graffen and Mr. Bell were agents of public officers and that the commissions were to go into the private pockets of their principals, the defendant would be as fully liable as the officers themselves; and its liability would be properly put upon the ground that it had been assisting in the violation of a public duty whereby the commonwealth was injured, and in the unlawful conversion of public money to private use. But Mr. Cook denies that he had any knowledge of the kind just described, and we do not dispute the accuracy of the denial. We accept the view that, in haste and without sufficient reflection, he dealt with these offers as if they had been the ordinary offers of private business, and that he did not draw the inferences which lie so near the surface of these interviews that a very

brief consideration would surely have brought them to his conscious notice. Nevertheless we believe the defendant to be liable, and we will briefly give our reasons :

" It is of course true that the agents did not mention their principals; Mr. Bell testified 'I took particular care not to,' and we do not doubt that Mr. Graffen was equally discreet. [But the very nature of their declared business was such that they were either representing the public officers in whose power alone it lay to award this advertising, or were officious meddlers with whom it was not worth while to deal.] [6] As a citizen Mr. Cook is presumed to have known the provision of law under which only two persons, the auditor general and city treasurer, could select the newspapers in which this advertising was to be done ; but, without laying stress upon the presumption, it is quite clear and reasonable that as a capable and intelligent man he must have seen at once that the proposition had to do, not with a private but with a public matter. The publication was manifestly official and could not possibly be mistaken for an item of private business. So much we may confidently affirm, and if Mr. Cook had gone on to think further about the proposition we have as little doubt that he would have taken the mental steps which must now appear so obvious. [Being an official publication, no private individual would have any occasion to publish the list, and no one but the proper public officer would be at all likely to have any business with the rates to be charged for such publication.] [7] Moreover, this was clearly not a simple preliminary inquiry about rates ; it was a distinct offer to sell for a specified price the order to do this advertising, and presumably, therefore, must come from the person who alone was able to sell, namely, the proper public officer. If after this the character of the agent still remained doubtful, all doubt would naturally disappear when he produced the very order which he was offering to sell, or when that order came shortly afterwards to the defendant's hand. [The inevitable conclusion from all these facts would be, that both Graffen and Bell were acting not for themselves but for some public officer in control of this matter ; and the fact that Mr. Cook did not draw this conclusion is only to be explained if (as appears to be the case) he did not think about the interviews at all. Under the circumstances this was culpable neg-

ligence. Mr. Cook was certainly put upon inquiry by the significant facts we have detailed, and upon familiar principles must be held to have known what inquiry would have disclosed.] [8]

" So, also, with regard to the destination of these commissions.

" [If Mr. Cook had properly considered, he could not have failed to see that some unlawful purpose must be in contemplation.] [9] The state was paying $10,000 for work which only cost $6,000, and the excess of $4,000 which was about to be delivered to the officers of the state or to their agents made no appearance upon the written evidence of the transaction. This delivery also of the money was as secret as the nature of the case would admit, and showed a desire to leave as few traces as possible. Putting all the facts together, no other object than unlawful private gain can be conceived, and this object would certainly have been seen then if the matter had received proper attention.

" The truth is, the facts are so plain as to make discussion difficult. It would be the ordinary case of a public officer agreeing to award a contract on condition of being paid a share of the profits—or, in other words, the ordinary case of a bribe given and taken—if it were not for the fact that Mr. Cook seems to have thought so little about the transaction as not to be aware that he was actually doing what we do not doubt he has since been shocked to recognize as bribing, lacking only the intention to bribe. [But the fact of his ignorance does not relieve the defendant of liability, if under the circumstances he ought to have known. In our opinion he was put upon notice ; he ought to have inquired and is therefore legally chargeable with the knowledge he would thus have gained.] [10]

" The general principle, that a public officer may not make a private profit out of his public duty, needs no authority, and while I am not able to cite any case in which an action of assumpsit was brought by the state to recover from the officer the profit thus made, I do not doubt that the well-settled rule which allows a private principal to recover from a corrupt private agent, either in assumpsit or in tort, applies also to a public principal and a public agent. Whether, or not, recovery may

be had from the corrupt or negligent participant in the wrong does not appear to have been decided in America; but the right to recover is supported by a recent decision in England (Mayor of Salford v. Lever, 25 Q. B. Div. 363), and seems to rest safely upon considerations of sound public policy. Courts ought to amplify their remedies so as to reach every possible variety of wrongdoing, either willful or negligent, and so as to enforce every degree of legal and public duty.

" One word with regard to the form of this action. The summons is in assumpsit, but the statement would probably serve as well if the action had been in tort. No objection was made to the action or to the statement, and we refer to the record only because the measure of damages requires us to notice it. The case was tried upon its merits, and if it is desired that the record be amended so as to conform to this decision, the proper order will be made. In our opinion, the facts proved make trespass and not assumpsit the proper form of action. The defendant does not have in its possession any money belonging to the commonwealth; it did have such money in its hands for a moment, but only for a moment, and we think the true cause of action is that which is stated above, namely: such negligent conduct as must be held to be the legal equivalent of guilty conduct, although as we have already found there was no guilty conduct in fact.

" Treating the action then as in tort, the defendant must make good the harm which its negligence helped to do; and this is measured by the amount of money of which the commonwealth was wrongfully deprived, with interest, as a part of the damages. We do not allow interest as such, but we think the facts require an allowance to be made in view of the lapse of time since the harm was done. The commonwealth is entitled to be made whole as of the time when it was deprived of its property, and this brings the case within Richards v. Gas Co., 130 Pa. 40, and permits us to allow not interest as such or as a matter of right, but ' compensation for the delay, of which the rate of interest affords the fair legal measure.'

" [We, therefore, conclude that the commonwealth is entitled to recover; and we assess the damages at $10,220.83, in which interest $936.26 is included upon $4,070.76 from May 31, 1889, to April 1, 1893, and upon $4,665.60 from April 15, 1891, to

April 1, 1893, $548.21; adding also $511 as commissions to
the attorney general, thus making a total of $10,731.83; for
which we direct judgment to be entered if exceptions are not
filed according to law.] " [11]

Exceptions (1–11), specifying the findings in brackets and
the rulings on evidence, were overruled and judgment entered.
Defendant appealed.

*Errors assigned* were dismissal of exceptions, quoting them.

*Lyman D. Gilbert, John H. Weiss* and *James H. Shakespeare,*
with him, for appellant.—The act of April 20, 1887, P. L. 60,
authorized the publication at the usual rates charged to private
parties not exceeding thirty cents a line. The selection of de-
fendant was therefore authorized.

Under the testimony defendant had a right to regard Bell
and Graffen as advertising agents, and to compensate them for
their services.

The cases cited by plaintiff held contracts void as against
public policy. But the legality of the employment of an agent
to make sale to the government of property owned by his prin-
cipal, and his right to recover as compensation a certain portion
of the proceeds of the sale, is well settled: Lyon v. Mitchell,
36 N. Y. 235; Southard v. Boyd, 51 N. Y. 177; Cummins v.
Bankalow, 4 Keys, 514; Howland v. Coffin, 47 Barb. 653.

*W. U. Hensel,* attorney general, *James A. Stranahan,* deputy
attorney general, *John R. Read* and *Furman Sheppard* with
him, for appellee.—An employer is entitled to recover what-
ever has been gained in fraud of him by his agent: 7 Law
Quarterly Rev. 462; Mayor v. Lever, 25 Q. B. Div. 363; Pol-
lock on Contracts, 337–9; Osborne v. Williams, 18 Ves. Jr.
382; Clippinger v. Hepbaugh, 4 W. & S. 315; Mills v. Mills,
1 Hand, 546.

An agreement to influence an officer of the state to act par-
tially or corruptly is void: Lucas v. Allen, 80 Ky. 681; Wo-
mack v. Lorain, 8 Cent. L. J. 332; O'Hara v. Carpenter, 23
Mich. 410; Caton v. Stewart, 76 N. C. 357; 3 A. & E. Enc.
L. 877; Ashburner v. Parrish, 81 Pa. 52; Thomas v. Caulkett,
57 Mich. 392; Marshall v. B. & O. R. R., 16 How. 334; Tool

Co. v. Norris, 2 Wall. 45; Filson's Trustees v. Himes, 5 Pa. 452; Martin v. Wade, 37 Cal. 168; Hunter v. Nolf, 71 Pa. 282; Cook v. Shipman, 51 Ill. 316; Bowman v. Coffroth, 59 Pa. 19; Hatzfield v. Gulden, 7 Watts, 152; Fuller v. Dame, 18 Pick. 472; Workman v. Campbell, 46 Mo. 305; Usher v. McBratney, 3 Dill. C. C. R. 388; Atcheson v. Mallon, 43 N. Y. 147; Richardson v. Crandall, 48 N. Y. 362; Satterlee v. Jones, 3 Duer, 102; Callagan v. Hallett & Brown, 1 Caine Tenn. Rep. 105; Waldron v. Evans, 1 Dakota, 11; Greenhood on Public Policy, 364; Winpenny v. French, 18 Ohio St. 469; Clarke v. Shee, Cowp. 197; Tracy v. Talmage, 4 Kernan, 200; Lancaster Co. v. Fulton, 128 Pa. 48.

Bell and Graffen were agents of the officials. Moneys obtained by them would be for the use of their principal. On the question of right to recover against defendant in this action the opinion of the court below is a landmark in our jurisprudence. Mayor v. Lever, 25 Q. B. Div. 363, was properly held to rule this case.

PER CURIAM, July 19, 1893 :

By agreement of parties this case was submitted to the court for trial without a jury, under provisions of the act of 1874. The facts found by the learned judge are embodied in the first five paragraphs of his opinion. These findings are followed by the several conclusions of law drawn therefrom, all of which are clearly and concisely stated in their order. Several exceptions, —some to conclusions of law and others to findings of fact,— were filed and afterwards overruled by the court, and thereupon judgment was entered against the defendant company. The first to third specifications of error are to findings of fact therein recited, the fourth and fifth are to the rejection of proposed testimony, the sixth to tenth are to conclusions of law recited therein, respectively, and the remaining two are to the judgment generally.

A careful examination of the record, with special reference to the several assignments of error aforesaid, has satisfied the majority that there is no substantial error in the findings of fact, rejection of testimony, or in the conclusions of law drawn from the facts, and that the questions involved in the several specifications of error were so fully considered and so satisfac-

torily disposed of by the learned trial judge that further discussion of any of them is not necessary. They therefore adopt his clear and comprehensive opinion sent up with the record, and, for reasons therein given, affirm the judgment.

Judgment affirmed.